# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

TANNERITE SPORTS, LLC,

<div style="margin-left:3em">Plaintiff,</div>

v.

NBCUNIVERSAL NEWS GROUP, A DIVISION
OF NBCUNIVERSAL MEDIA, LLC and WLEX
COMMUNICATIONS, LLC

<div style="margin-left:3em">Defendants.</div>

Index No.: 1:15-cv-02343

**ECF Case**

## MEMORANDUM OF LAW IN SUPPORT OF
## NBCUNIVERSAL MEDIA, LLC'S MOTION TO DISMISS

Daniel M. Kummer
Chelley E. Talbert
Sasha Segall
NBCUNIVERSAL MEDIA, LLC
30 Rockefeller Plaza, Rm. 1221-28A18
New York, New York 10112-0002
Phone: (212) 664-4017
Fax: (212) 664-6572
Email: daniel.kummer@nbcuni.com

*Attorneys for Defendants NBCUniversal
Media, LLC*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT   1

STATEMENT OF FACTS   1

ARGUMENT   10

I.    PLAINTIFF FAILS TO STATE A CLAIM FOR DEFAMATION   11

   A.   "Bomb" is Either Substantially True or Too Imprecise to be Provably False   11

   B.   Plaintiff Has Failed To Make The Rigorous Showing Of Defamation By Implication   15

   C.   Plaintiff Has Failed To Plead Facts Demonstrating that NBC News Acted With the Requisite Degree of Fault   16

     1.   Plaintiff is a limited purpose or involuntary public figure.   16

     2.   Plaintiff's bare allegations of actual malice are insufficient.   19

     3.   The NBC Report Was Well Within the Sphere Of Public Concern and Plaintiff Cannot Allege "Gross Irresponsibility" On the Part Of NBC News.   21

II.    NBC IS NOT VICARIOUSLY LIABLE FOR WLEX'S REPORTS   24

III.    PLAINTIFF IS NOT ENTITLED TO INJUNCTIVE RELIEF   24

CONCLUSION   25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelson v. Harris,*
    973 F. Supp. 2d 467 (S.D.N.Y. 2013).............................................................10, 21

*Albert v. Loksen,*
    239 F.3d 256 (2d Cir. 2001)........................................................................11

*Alexander v. United States,*
    509 U.S. 544 ...........................................................................................24

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..................................................................................10

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)..................................................................................10

*Biro v. Conde Nast,*
    883 F. Supp. 2d 441 (S.D.N.Y. 2012).....................................................1, 10, 11

*Biro v. Conde Nast,*
    963 F. Supp. 2d 255 (S.D.N.Y. 2013).............................................................17, 21

*Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,*
    369 F.3d 212 (2d Cir. 2004)........................................................................2

*Cancer Action NY v. St. Lawrence Cnty. Newspapers Corp.,*
    12 A.D.3d 880, 784 N.Y.S.2d 727 (3d Dep't 2004) .................................................20

*Catalanello v. Kramer,*
    18 F. Supp. 3d 504, 511 (S.D.N.Y. 2014) ........................................................10

*Celle v. Filipino Reporter Enterprises Inc.,*
    209 F. 3d 163 (2d Cir. 2000).................................................................11, 17, 20

*Cerasani v. Sony Corp.,*
    991 F. Supp. 343 (S.D.N.Y. 1998) ................................................................2

*Chaiken v. VV Pub. Corp.,*
    119 F.3d 1018 (2d Cir. 1997).......................................................................23

*Chaiken v. VV Publ'g Corp.*,
   907 F. Supp. 689 (S.D.N.Y. 1995), *aff'd sub nom. Chaiken v. VV Pub. Corp.*,
   119 F.3d 1018 (2d Cir. 1997)..................................................................................22

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002).......................................................................................2

*Chapadeau v. Utica Observer-Dispatch*,
   38 N.Y.2d 196, 379 N.Y.S.2d 61 (1975) ................................................................22

*Chapin v. Knight-Ridder, Inc.*,
   993 F2d 1087 (4th Cir. 1993) ..................................................................................15

*Chau v. Lewis*,
   771 F.3d 118 (2d Cir. 2014)...............................................................................14, 15

*Contemporary Mission, Inc. v. New York Times Co.*,
   842 F.2d 612 (2d Cir. 1988).........................................................................16, 17, 20

*Crucey v. Jackall*,
   275 A.D.2d 258, 713 N.Y.S.2d 20 (1st Dep't 2000) ..............................................22

*Daniel Goldreyer, Ltd. v. Dow Jones & Co.*,
   259 A.D.2d 353, 687 N.Y.S.2d 64 (1st Dep't 1999) ..............................................18

*DiFolco v. MSNBC Cable L.L.C.*,
   622 F.3d 104 (2d Cir. 2010)......................................................................................1

*Dillon v. City of New York*,
   261 A.D.2d 34, 704 N.Y.S.2d 1 (1999) ..................................................................14

*Egiazaryan v. Zalmayev*,
   880 F. Supp. 2d 494 (S.D.N.Y. 2012)................................................................12, 14

*Fairley v. Peekskill Star Corp.*,
   83 A.D.2d 294, 445 N.Y.S.2d 156 (2d Dep't 1981) ...............................................12

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974)............................................................................................16, 17

*Guccione v. Hustler Magazine, Inc.*,
   800 F.2d 298 (2d Cir. 1986)....................................................................................12

*Hatfill v. N.Y. Times Co.*,
   488 F. Supp. 2d 522 (E.D. Va. 2007), *aff'd on other grounds*, 532 F.3d 312
   (4th Cir. 2008).........................................................................................................18

*Immuno AG. v. Moor-Jankowski,*
    77 N.Y.2d 235, 566 N.Y.S.2d 906 (1991) ........................................................10, 15

*Ithaca Coll. v. Yale Daily News Pub. Co.,*
    433 N.Y.S.2d 530 (Sup. Ct. 1980), *aff'd*, 85 A.D.2d 817, 445 N.Y.S.2d 621
    (3d Dep't 1981)........................................................................................................17

*James v. Gannett Co.,*
    40 N.Y.2d 415, 386 N.Y.S.2d 871 (1976) ........................................................16, 17

*Kelly v. State,*
    131 A.D.2d 176, 520 N.Y.S.2d 959 (3d Dep't 1987) ..............................................18

*Konikoff v. Prudential Ins. Co. of Am.,*
    234 F.3d 92 (2d Cir. 2000)......................................................................................22

*Lerman v. Flynt Distrib. Co.,*
    745 F.2d 123 (2d Cir. 1984)...............................................................................17, 20

*Locke v. Aston,*
    No. 605851/00, 2002 WL 34357990 (N.Y. Sup. Ct., July 26, 2002) ......................14

*Lusk v. Vill. of Cold Spring,*
    475 F.3d 480 (2d Cir. 2007)....................................................................................25

*McGill v. Parker,*
    179 A.D.2d 98, 582 N.Y.S.2d 91 (1st Dep't 1992) ................................................24

*Med-Sales Assocs., Inc. v. Lebhar-Friedman, Inc.,*
    663 F. Supp. 908 (1987) .........................................................................................23

*Medcalf v. Walsh,*
    938 F. Supp. 2d 478 (S.D.N.Y. 2013).....................................................................24

*Melnitzky v. Rose,*
    299 F. Supp. 2d 219 (S.D.N.Y. 2004) *aff'd in part*, 148 Fed. Appx. 11 (2d Cir.
    2005) ......................................................................................................................24

*Near v. Minnesota,*
    283 U.S. 697 (1931)................................................................................................25

*Nebraska Press Ass'n v. Stuart,*
    427 U.S. 539 (1976) ...............................................................................................24

*New Era Publications Int'l, ApS v. Henry Holt & Co.,*
    695 F. Supp. 1493 (S.D.N.Y. 1988) *aff'd*, 873 F.2d 576 (2d Cir. 1989)................25

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964)...............................................................20

*Org. for a Better Austin v. Keefe,*
    402 U.S. 415 (1971)..............................................................25

*Park v. Capital Cities Commc'ns, Inc.,*
    585 N.Y.S.2d 902 (1992)........................................................14

*Philadelphia Newspapers v. Hepps,*
    475 U.S. 767 (1986)..............................................................11

*Printers II, Inc. v. Prof'ls Publ'g, Inc.,*
    784 F.2d 141 (2d Cir.1986).....................................................12

*Rinaldi v. Holt, Rinehart & Winston, Inc.,*
    42 N.Y.2d 369, 397 N.Y.S.2d 943, *cert. denied,* 434 U.S. 969 (1977) ...................11

*Sell It Soc., LLC v. Acumen Brands, Inc.,*
    No. 14 CIV. 3491 RMB, 2015 WL 1345927 (S.D.N.Y. Mar. 20, 2015) ...............12

*Sheridan v. Carter,*
    48 A.D.3d 447, 851 N.Y.S.2d 252 (2d Dep't 2008) ..........................22

*St. Amant v. Thompson,*
    390 U.S. 727 (1968)..............................................................20

*Staehr v. Hartford Fin. Servs. Grp., Inc.,*
    547 F.3d 406 (2d Cir. 2008)......................................................6

*Stepanov v. Dow Jones & Co.,*
    120 A.D.3d 28, 987 N.Y.S.2d 37 (1st Dep't 2014) .........................15

*United States v. Brown,*
    669 F.3d 10 (1st Cir. 2012).................................................3, 14

*United States v. Brown,*
    No. 09-cr-30-01-02-GZS (D.N.H. 2009) ..................................2, 13

*United States v. Graziano,*
    616 F. Supp. 2d 350 (E.D.N.Y. 2008) *aff'd,* 391 F. App'x 965 (2d Cir. 2010)........13

*United States v. Sheehan,*
    No. 13-CR-0186 (DRH), 2014 WL 3490323 (E.D.N.Y. July 11, 2014) ...............13

*Waldbaum v. Fairchild Pub'ns,*
    627 F.2d 1287 (D.C. Cir. 1980), *cert. denied,* 449 U.S. 898 (1980) ....................18

*Wells v. Liddy,*
    186 F.3d 505 (4th Cir. 1999) ...................................................................................18

**Statutes**

MD. CODE ANN, Public Safety, § 11-101(c)(2)(ii) ...........................................................5

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)..............................................................................................1, 10

Fed. R. Evid. 201(b)..........................................................................................................2

KS S. B. 227 (Feb. 28, 2013).............................................................................................6

RI S. B. 337 (Feb. 12, 2015)..............................................................................................5

VA S. J. Res. 279 (Jan. 14, 2015) .....................................................................................5

NBC News, a division of Defendant NBCUniversal Media, LLC ("NBC News"), by its attorneys, respectfully submits this memorandum of law in support of its motion to dismiss the Amended Complaint in its entirety.

## PRELIMINARY STATEMENT

The Plaintiff in this defamation case manufactures a rifle-target product that Plaintiff itself and multiple federal agencies have described as a "high explosive." Plaintiff claims it was defamed by NBC News reports that referred to the product as a "bomb" while also explicitly and repeatedly stating that the product is legal. As fully set forth below, the Amended Complaint should be dismissed with prejudice as to NBC News because the use of the term "bomb" was either substantially true or too imprecise to be provably false, and because Plaintiff has in any event failed to satisfy the standards for pleading fault on the part of NBC News.

## STATEMENT OF FACTS

On March 23, 2015, NBC News aired an investigative news report within the "Today" show about exploding rifle targets available for purchase at retail by consumers (the "NBC Report").[1] Plaintiff Tannerite Sports, LLC ("Plaintiff") is one of the leading manufacturers and sellers of such targets, although the NBC Report referred to other manufacturers as well. Plaintiff claims it was defamed by the NBC Report's reference to its products as "bombs."[2]

---

[1] A true copy of the NBC Report in DVD format is attached as Ex. 1 to the accompanying Declaration of Chelley E. Talbert ("Talbert Decl."), and a transcript of the NBC Report is attached as Ex. 2. A true copy of an Internet article based on the NBC Report that was published by NBCUniversal on the NBC News website on the same date (the "NBC Internet Report") is attached as Talbert Decl., Ex. 3. The Court is permitted to consider the contents of the NBC Report and the NBC Internet Report on a motion pursuant to Fed. R. Civ. P. 12(b)(6). *See, e.g.*, *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 455 (S.D.N.Y. 2012).

[2] Plaintiff has also named WLEX Communications, LLC ("WLEX"), a television station in Lexington, Kentucky that broadcasts NBC Network programming but is not owned or operated by NBCUniversal. Plaintiff alleges that WLEX's own news reports also contained false and

1

### 1. **Exploding Rifle Targets**

As required by law, the following allegations of the Amended Complaint are presumed to be true solely for purposes of this motion.  According to the Amended Complaint, exploding rifle targets of the type manufactured by Plaintiff and others are sometimes referred to as "binary" targets because they are comprised of two chemical components, or "precursors": ammonium nitrate and powdered aluminum.  Am. Compl. ¶¶ 58, 63.  The two components of the exploding target are packaged separately in a kit and must be mixed together by the consumer in a plastic container prior to use.  Am. Compl. ¶¶ 59-60.  As the Court can take judicial notice,[3] Plaintiff's CEO Daniel Tanner testified in a federal criminal trial in 2009 that when the two chemical components of his company's target product are mixed together, "*[i]t becomes a high explosive.*" Tr. of Trial at 17, *United States v. Brown*, No. 09-cr-30-01-02-GZS (D.N.H. 2009) (No. 227) (emphasis added). Talbert Decl. Ex. 4.  Later in his testimony he referred to the product as a "high order explosive."  *Id.* at 40.  On appeal in the same case, the First Circuit itself repeatedly

---

defamatory statements.  This motion does not address claims against WLEX, which is separately represented, except to challenge, in Point II below, Plaintiff's allegation that NBCUniversal is "contributorily or vicariously liable for WLEX's libel and slander."

[3] On a motion to dismiss for failure to state a claim pursuant to Fed. R. 12(b)(6), the Court can consider "documents attached to the complaint as an exhibit or incorporated in it by reference, ... matters of which judicial notice may be taken, or ... documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal citations omitted).  Pursuant to Fed. R. Evid. 201(b), "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Accordingly, a court can "look to public records, including complaints filed in ... court, in deciding a motion to dismiss." *Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004).  Judicial notice is permitted as to prior trial testimony, when cited "not . . . for the truth of the matters asserted, but rather 'to establish the fact of such litigation and related filings.'" *See Cerasani v. Sony Corp.*, 991 F. Supp. 343, 354 n.2 (S.D.N.Y. 1998) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

referred to the explosive devices about which Mr. Tanner testified as "bombs." *See United States v. Brown*, 669 F.3d 10, 15-16, 20 (1st Cir. 2012).

The intended use of an exploding binary rifle target is as a "shot indicator" for target practice at rifle ranges. Am. Compl. ¶54. If a round fired from a high-powered center-fire rifle hits the target (filled with the ammonium nitrate/aluminum mixture), it causes the target to detonate and explode in a manner that "produce[s] water vapor and an audible boom." Am. Compl. ¶ 53. However, Tannerite's own "Safety Essentials" materials warn the chemical reaction is less benign than described in the body of the Amended Complaint:

> The bullet impact provides sufficient energy to initiate a reaction between aluminum and ammonium nitrate that results in detonation of the composition. This detonation is a very energetic process and binary targets should be treated with respect. Be sure that all observers are over 100 yards away from the target and that no foreign objects are in close proximity to the target that could serve as a source of shrapnel.

Am. Compl., Ex. A at p. 3.

The Amended Complaint further alleges that "Tannerite rifle targets use high quality chemical precursors to ensure that the explosion of a Tannerite-brand product is non-incendiary [.]" Am. Compl. at ¶ 57. Indeed, the Amended Complaint repeatedly alleges that the product is "non-incendiary." *See also, e.g., id.* at ¶¶ 94, 97. Again, however, Plaintiff's safety materials attached to the Amended Complaint acknowledge that the same may not be true of *all* binary exploding rifle targets, or even Plaintiff's own if "poor[ly] mix[ed]":

> The major factors affecting binary exploding rifle target performance include the purity of the components, the particle size of the components, the ratio of oxidizer to catalyst and the uniformity of the mixed composition – Tannerite is precise in all instances. Changes in any of the aforementioned factors will affect the chemical pathway taken during detonation, *which can result in fires*, increased energy required for detonation and sound amplitude variations. . . . The use of impure ammonium nitrate or aluminum, wide variability in ammonium nitrate and aluminum particle sizes, the wrong ratio of aluminum to ammonium nitrate and

> poor mixing *can lead to targets that may start fires*, may be less safe to handle
> and have erratic performance.

Am. Compl., Ex. A at p. 3 (emphasis added).  Additional Tannerite instructional materials

appended to the Amended Complaint contain the following warnings:

> While our targets will not start a fire, do not use on public property when there is
> a general fire order in effect or near combustible materials.  . . . *By mixing
> Tannerite® Brand Binary Rifle Targets, you become the manufacturer of an
> explosive and assume any and all liabilities*.

Am. Compl., Ex. B, at p. 2 (emphasis added).

In those same materials, Plaintiff further implores its customers to avoid "[a]cts of

stupidity" that will "ruin it for everyone else." Am. Compl., Ex. B, at p. 1.  Yet, it is not only

potential "acts of stupidity" that have raised concern among law enforcement regarding the use –

or misuse – of exploding rifle targets.   As the Court can take further judicial notice, two federal

law enforcement agencies and a multi-agency task force have issued official advisories

concerning the dangers associated with such products.  In March 2013, the FBI's Terrorist

Explosive Device Analytical Center issued an official "Intelligence Bulletin" entitled "Exploding

Targets: Potential Use as Explosives in IEDs and Alternative Source of Ammonium Nitrate" (the

"FBI Bulletin").  *See* Talbert Decl., Ex. 5.  The FBI Bulletin states, in pertinent part:

> The FBI assesses with high confidence recreationally used exploding targets
> (ETs), commonly referred to as tannerite, or reactive targets, can be used as an
> explosive for illicit purposes by criminals and extremists and explosive precursor
> chemicals (EPCs) present in ETs can be combined with other materials to
> manufacture explosives for use in improvised explosive devices (IEDs). . . . .
> While the intended purpose of ETs is for verification of a successful shot on
> target, the FBI has identified multiple incidents where criminals and extremists
> have explored the possibility of employing the binary explosive mixture obtained
> from ETs as a means to commit criminal and terrorist acts. . . . .
> Among the possible alternative sources of ammonium nitrate, ETs are seen by the
> FBI to be one of the greatest sources of concern, since ETs can be easily acquired
> domestically and have the potential to be used directly as an explosive charge in
> criminal and terrorist IEDs or as an alternative product for explosive precursor
> acquisition.

On May 29, 2015, the National Explosives Task Force ("NETF"), comprised of the federal Departments of Justice, Homeland Security and Defense and the Office of the Director of National Intelligence, issued a "Public Safety Advisory" concerning "Exploding Targets" (the NETF Advisory"), stating:

> Exploding targets (ETs) are a combination of non-explosive chemicals sold in a pre-packaged form that, when thoroughly mixed, form a high explosive for use in shooting sports.  ETs are designed to explode when struck by a high velocity bullet and produce both an audible and visual effect for target shooters.  While most people who use ETs do so in a recommended and responsible manner, a number of individuals have been seriously injured or killed by their misuse. *These explosives produce a blast and, if misused, can potentially generate high velocity fragments that can cause damage to nearby objects and could injure or kill people.*

Talbert Decl., Ex. 6 (emphasis added).

The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") also describes Tannerite products as explosives.  Am. Compl. ¶ 67.  On June 10, 2015 the ATF issued a "Special Advisory" that linked to the NETF Advisory and additional general information on explosives, and added its own warnings:

> [ATF] along with the National Explosives Task Force (NETF) is increasing awareness on the potential dangers of misusing exploding targets in response to the number of reported accidents and in the interest of public safety. Exploding targets are not regulated by ATF but can pose serious injuries or death if incorrectly used by a sportsman. The advisory is designed to inform people using or encountering the targets that, *when mixed, they are high explosives* and should be treated with caution and in accordance with manufacturer's instructions.

Talbert Decl., Ex. 7 (emphasis added).[4]

---

[4] In addition, two states have enacted laws or resolutions concerning the use of Tannerite and other explosive targets. MD. CODE ANN, Public Safety, § 11-101(c)(2)(ii) (Maryland statute expanding the definition of explosives to include "two or more components that are advertised and sold together with instructions on how to combine the components to create an explosive"); VA S. J. Res. 279 (Jan. 14, 2015) (establishing joint subcommittee in Virginia "to study the dangers of Tannerite").  Talbert Decl., Ex 8. Other states have proposed such legislation.  See, e.g., RI S. B. 337 (Feb. 12, 2015) (Rhode Island bill proposing criminalization of sale of "Tannerite binary exploding targets" and classifying product as weapon); KS S. B. 227 (Feb. 28,

## 2. <u>The NBC Reports</u>

The NBC Report that aired on the March 23, 2015 Today Show similarly focused on the undisputed dangers from *misuse* of exploding rifle targets, while repeatedly emphasizing that such products, including those manufactured by Plaintiff, are *legal* and can be legally purchased in retail sporting goods stores and through online purchases.  Talbert Decl., Exs. 1 and 2.[5]

In his live lead-in to the NBC Report, NBC News Correspondent Jeff Rossen stated:

> Hey, guys, good morning. This is an important one.  Right now, I am basically holding a bomb in my hand and you'll never believe where I got this. A sporting goods store, no questions asked. Gun enthusiasts say they use it for target practice. When you shoot it, it explodes, and that's how you know you made the shot. But the key ingredient here that causes the explosion has been used by terrorists to kill Americans. So why are you allowed to buy it by the truckload here as much as you want? This morning, you`re about to see what can happen when this gets in the wrong hands.

---

2013) (Kansas bill proposing required permits for manufacture, sale, and use of explosives, including "any binary explosive, or tannerite explosive").  *Id*.  The U.S. Forest Service has also criminalized use of binary exploding targets on National Forest and Grasslands in the Rocky Mountains, citing risk of wildfires and danger to surrounding communities.  Talbert Decl., Ex. 9.

[5]  As the Court can take further judicial notice on a motion to dismiss, *see Staehr v. Hartford Fin. Servs. Grp., Inc.,* 547 F.3d 406, 425 (2d Cir. 2008), prior to the NBC Reports other media entities also reported on Tannerite and its potential for misuse and deadly injury, and several, like NBC News, used the word "bomb" in their titles.  *See, e.g.,* Mike M. Ahlers & Rene Marsh, *Exploding Targets: Shooting Aid or a 'Bomb Kit For Dummies'?*, CNN NEWS (Sep. 9, 2013); Joseph J. Kolb, *Popular Gun Range Target Blamed for Forest Fires, Called Potential Bomb Source*, FOX NEWS (Aug. 6, 2013), Spencer Ackerman, *FBI Warned in March That 'Exploding Targets' Could Fuel Homemade Bombs*, WIRED (Apr. 17, 2013); *see also Sheriff: Boy, 8, Killed in Oklahoma Stove Explosion*, N.Y. TIMES (Feb. 9, 2015); Kristine Guerra, *Proposal to Restrict Sale of Explosive Used in Online Videos*, USA TODAY (Jan. 5, 2015); Nick McFerron, *Gibson County Explosion Caused by Tannerite*, THE JACKSON SUN (Dec. 30, 2014); David Koon, *Unrestricted High Explosives, Available at a Sporting Goods Store Near You*, ARKANSAS TIMES (Dec. 18, 2014); Kurtis Ming, *Call Kurtis Investigates: Explosive Danger During Fire Season*, CBS SACRAMENTO (Sep. 22, 2014); *Ex-Nuclear Plant Contractor Charged With Terroristic Threats*, NY TIMES (May 28, 2015); Jillian Corder, *Tannerite Targets Rattle Kelly Residents*, Knoe.com (Mar. 21, 2015); Natassia Bonyanpour, *Tannerite Creator Warns Against Product Misuse*, VICTORIA ADVOCATE (Mar. 8, 2015); Dillon Thomas, *VIDEO: Washington County Sheriff's Office Demonstrates Danger of Tannerite*, 5NEWS (Feb. 12, 2015). *See* Talbert Decl., Exs. 10-12.

The NBC Report proceeded to show portions of Internet video clips of explosions involving exploding rifle targets made by unidentified manufacturers, including an accident involving a refrigerator used as a rifle target in which a bystander, Jennifer Plank, had her hand blown off by shrapnel from the explosion.  The Report then referred to Plaintiff as the "leading" – not the sole – manufacturer, and discussed the role of the key ingredient, ammonium nitrate, in the Oklahoma City bombing and in attacks on U.S. troops in Afghanistan. The Report showed a graphic consisting of an excerpt of the FBI Bulletin.  The Report then proceeded to a video sequence and voice-over depicting bulk purchases of Tannerite targets made by the NBC News reporters in a sporting goods store and for delivery to NBC News' offices.

The NBC Report showed excerpts of an interview with firearms expert, Travis Bond, who stated: "I'm a huge supporter of the Second Amendment, but it's extremely dangerous. It's equivalent of buying explosives off the shelf. ... Everything you need comes with a package that you purchase off the shelf."  After mixing the two components of the target together, Bond stated:  "This is now classified by ATF as an explosive."

The NBC Report next included portions of an interview with U.S. Senator Richard Blumenthal of Connecticut, who stated on camera:

> *This kind of bomb-making material* is a real threat and a growing risk. . . . There should be regulation that, in effect, either require licenses or somehow better track the purchases of these devices. . . . I am going to press the ATF and other government agencies to do more and do it better.  There is no justification for buying this product in bulk." (Emphasis added)

Finally, the NBC Report included a statement from Plaintiff and reiterated that its products can be legally purchased without a license in all but one state:

> Tannerite [is] telling NBC News no additional regulations are needed beyond current laws because the product is safe when used correctly. And the only injuries that have ever happened were results from the shooter misusing the

7

product. The company adding, "Only girly-men want to regulate Tannerite rifle targets."

The NBC Internet Report covered the same group of subjects and interviews as the NBC Report. *See* Talbert Decl., Ex. 3.   The headline of the NBC Internet Report was "Bombs for sale: Targets containing dangerous explosive being *sold legally*." *Id.* (emphasis added).

### 3.   **The Amended Complaint**

Plaintiff identifies <u>two</u> allegedly false and defamatory statements by NBC News:  (i) the use of the phrase "Bombs for sale" in the title of the NBC Internet Report, Am. Compl. at ¶ 74; and (ii) Jeff Rossen's assertion in the lead-in to the NBC Report that "Right now I am basically holding a bomb in my hand," while allegedly "holding Tannerite products." *Id.* at ¶ 75.

The Amended Complaint also makes general allegations concerning the "gist" of, or matters allegedly "implied" by, the NBC Reports, without reference to any specific statement in the Reports, including: (i) that "[t]he gist of NBCU's report was that Tannerite-brand targets are dangerous bombs as sold on store shelves;" (ii) that "NBCU's report also recklessly implied that a Tannerite-brand target had caused serious injuries to a woman in Ohio;" (iii) that "NBCU's report further recklessly implied that the FBI opposes the sale of Tannerite-brand targets;"[6] and (iv) that "NBCU's report further implied that a firearms expert, Mr. Travis Bond, opposes the sale of Tannerite-brand targets," all of which are alleged to be "false." *Id.* at ¶¶ 76-79.

Following a series of allegations concerning the independently published WLEX Report, the Amended Complaint alleges that "[b]ombs are destructive devices that are strictly regulated by the federal and state governments" and that "Plaintiff's rifle targets are not bombs." *Id.* at ¶¶

---

[6] The Amended Complaint alleges that "[r]ather, the FBI has determined that self-initiated reporting through tripwire programs regarding sales of chemical precursors (like the ones in Tannerite-brand targets) has been the most effective way to identify potential criminal or terrorist activity. *Thus, the sale of Tannerite-brand targets helps to make America safer for everyone.*" *Id.* at ¶ 78 (emphasis added.)  This allegation is belied by the government advisories, bans, and proposed legislation cited above.

83-84. The Amended Complaint further alleges, without citation, that "Federal guidelines not only allow consumers to purchase Tannerite-brand rifle targets for personal non-commercial use, but also allow consumers to mix the precursors at the target-practice location and shoot the target[,]" and that "Tannerite-brand rifle targets can be legally used for sporting activities." *Id.* at ¶¶ 85-86. The NBC Reports made precisely the same point.

The Amended Complaint attempts to allege that NBC News acted with reckless disregard for the truth, asserting in conclusory fashion that "Defendants had no credible evidence supporting the truth or veracity of their defamatory statements." *Id.* at ¶ 90. The Amended Complaint alleges that NBC News contacted Plaintiff's CEO before the report and that he explained the safety of his target products, that NBC News "knew" of the "non-incendiary" and "inert" qualities of the targets, but that NBC News proceeded with its "false report" in disregard of Plaintiff's safety assurances and other safety information that NBC News could have located. *Id.* at ¶¶ 91-97. The Complaint then alleges, without citation or quotation, that "[u]pon information and belief, even after the Complaint was filed in this action, NBCU continued to publicly assert that rifle targets are bombs that are for sale in sporting stores." Id at ¶ 98. The Complaint further alleges, as to both NBC News and WLEX, that "Defendants' publications and videos themselves evidence a malicious intent through word selection, context, images of fiery explosions, dramatic delivery, emphasis, and general failure to accurately describe the safety features and chemical characteristics upon which Tannerite Sports has built its reputation." *Id.* at ¶ 100. Finally, the Complaint concludes with a series of boilerplate allegations of fault and injury without further factual support. *Id.* at ¶ 101-105.

## ARGUMENT

A complaint should be dismissed if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief 'requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Rather, the complaint must allege facts sufficient to "raise a right to relief above the speculative level." *Id.* at 570.

"[T]here is 'particular value' in resolving defamation claims at the pleading stage, 'so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms.'" *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 457 (S.D.N.Y. 2012) (quoting *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 379 (1995)); *Catalanello v. Kramer*, 18 F. Supp. 3d 504, 511 (S.D.N.Y. 2014) (same); *see also Adelson v. Harris*, 973 F. Supp. 2d 467, 481 (S.D.N.Y. 2013) ("Because a defamation suit may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, courts should, where possible, resolve defamation actions at the pleading stage") (internal quotation omitted).

The New York Constitution affords even broader protection for speech than does the First Amendment. *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 249, 566 N.Y.S.2d 906, 913 (1991) ("That tradition is embodied in the free speech guarantee of the New York State Constitution [which] reflects the deliberate choice . . . not to follow the language of the First Amendment."). The New York Court of Appeals has counseled against construing non-actionable speech too narrowly, lest insufficient protection be given to the free speech values protected by New York law. *Id.* at 913-14.

10

## I.  PLAINTIFF FAILS TO STATE A CLAIM FOR DEFAMATION

The elements of a cause of action for defamation under New York law are (1) a defamatory statement of fact; (2) that is false; (3) published without privilege to a third party; (4) of and concerning the plaintiff; (5) made with the requisite degree of fault on the part of the speaker; (6) and causing special harm or defamation per se.  See, e.g., *Albert v. Loksen*, 239 F.3d 256, 265-66 (2d Cir. 2001); *Celle v. Filipino Reporter Enterprises Inc.*, 209 F. 3d 163, 176 (2d Cir. 2000); *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012).  Each element must be sufficiently alleged for a complaint to survive a 12(b)(6) motion.  *E.g., Albert*, 239 F.3d at 265-66.  Plaintiff has not done so and, as a result, the Complaint must be dismissed.

### A.  "Bomb" is Either Substantially True or Too Imprecise to be Provably False

Insofar as the Amended Complaint addresses any specific statements in the NBC Reports, Plaintiff identifies only two allegedly false and defamatory statements: (1) the use of the phrase "Bombs for sale" in the title of the NBC Internet Report published contemporaneously with the NBC Report (Am. Compl. ¶ 32); and (2) the assertion by NBC's reporter at the beginning of the broadcast of the NBC Report that "Right now I am basically holding a bomb in my hand" while he appeared on screen allegedly "holding Tannerite products." (Am. Compl. ¶ 33).  Plaintiff's claim for defamation based on these statements cannot succeed because the NBC Reports' use of the term "bomb" to describe a product that its own manufacturer calls a "high explosive" is, at a minimum, *substantially* true and therefore not actionable as a matter of law.  Furthermore, even if not deemed substantially true as a matter of law as used here, the term "bomb" is too imprecise as used in common parlance to be *provably false*.

Plaintiff has the burden of proving the falsity of the challenged statements.  *Philadelphia Newspapers v. Hepps*, 475 U.S. 767, 776 (1986); *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 380, 397 N.Y.S.2d 943, 950, *cert. denied,* 434 U.S. 969 (1977).  Under New York

law, "[i]t is only necessary that the *gist or substance* of the challenged statements be true."

*Printers II, Inc. v. Prof'ls Publ'g, Inc.*, 784 F.2d 141, 146 (2d Cir.1986) (emphasis added.)

"Substantial truth" is sufficient to defeat a claim of libel. *Guccione v. Hustler Magazine, Inc.*,

800 F.2d 298, 301 (2d Cir. 1986); *Fairley v. Peekskill Star Corp.*, 83 A.D.2d 294, 297, 445

N.Y.S.2d 156, 159 (2d Dep't 1981). When a statement is deemed substantially true, the

complaint should be dismissed, "regardless of any impact the statement might have had on

[Plaintiff's] reputation." *Guccione*, 800 F.2d at 301 (2d Cir. 1986).

In assessing substantial truth, "[t]he Court must read the statement 'in context to test [its]

effect on the average reader, not to isolate particular phrases but to consider the publication as a

whole.'" *Sell It Soc., LLC v. Acumen Brands, Inc.*, No. 14 CIV. 3491 RMB, 2015 WL 1345927,

at *6 (S.D.N.Y. Mar. 20, 2015) (quoting *Immuno AG.*, 566 N.Y.S.2d at 914). "'When the truth

is so near to the facts as published that fine and shaded distinctions must be drawn and words

pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done.'"

*Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 504 (S.D.N.Y. 2012) (quoting *Cafferty v. S. Tier

Publ'g Co.*, 226 N.Y. 87, 93 (1919)); *Guccione*, 800 F.2d 298, 303 (2d Cir. 1986).

At the outset, to the extent Plaintiff contends that NBC News used the word "bomb" to

suggest that binary exploding rifle targets are *illegal*, that inference is belied by the plain text of

the NBC Reports. The references to "bombs" occurred in the context of a news report that

repeatedly emphasized that such targets are *legal* and can be legally purchased in retail sporting

goods stores and through online purchases. Indeed, that was *the key point* of the NBC Reports.

The NBC Reports did not state or suggest that Plaintiff violated any law.

The term bomb is fluid and "has several meanings." *See United States v. Sheehan*, No.

13-CR-0186 (DRH), 2014 WL 3490323, at *5 (E.D.N.Y. July 11, 2014) (defining a "bomb" as

12

"'an explosive device fused to detonate under specified conditions,' 'a vessel for compressed gases' and 'a lead-lined container for radioactive material.'") (citing Merriam–Webster.com); *United States v. Graziano*, 616 F. Supp. 2d 350, 359-60 (E.D.N.Y. 2008) *aff'd*, 391 F. App'x 965 (2d Cir. 2010) (defining "bomb" as "a container of explosive or incendiary material, designed to explode on impact or when detonated by a timer or remote-control"); MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/bomb (visited June 19, 2015) (defining a bomb as "a device that is designed to explode in order to injure or kill people or to damage or destroy property," "something that is a complete failure," or "an explosive device fused to detonate under specified conditions"). Under these definitions, "it is not critical that a bomb contain explosives, but rather that it be capable of exploding." *Graziano*, 616 F. Supp. 2d at 359 (citing Merriam-Webster.com/dictionary/bomb.).

Critically, all of these various "bomb" definitions describe a bomb as a device or material that *can explode when detonated.* It is undisputed that Tannerite, when mixed, "explodes" when detonated by a high-speed rifle bullet. Plaintiff's own promotional and warning labels reference the explosive nature of the product. *See* Am. Compl. Ex. A (defining the product as "Brand Binary *Exploding* Targets,") (emphasis added); Am. Compl. Ex. B ("By mixing Tannerite® Brand Binary Rifle Targets, you become the manufacturer of an *explosive*.") (emphasis added). Plaintiff's CEO, Daniel Tanner, agrees, testifying in a federal criminal trial in 2009 that when the two chemical components of his binary target product are mixed together, "[i]t becomes a high *explosive.*" *United States v. Brown*, No. 09-cr-30-01-02-GZS (trial testimony of Daniel Tanner, July 6, 2009) (emphasis added).  In that same case, the First Circuit referred to Tannerite and "bombs" interchangeably. *See Brown*, 669 F.3d at 15-16, 20 ("Following their arrests, agents searched the Brown property and found a vast supply of explosives, firearms, and ammunition,

13

including . . . bombs nailed to trees."). Accordingly, referring to Plaintiff's product as a "bomb" or "basically a bomb" is substantially true: Tannerite is an explosive – indeed, by its manufacturer's own description and that of several law enforcement agencies, a "*high* explosive" – and thus it is accurately described within common usage of the word "bomb."[7]

A corollary to the rule of "substantial truth" is that some words can simply be "too vague and imprecise in meaning to support a defamation claim." *Dillon v. City of New York,* 261 A.D.2d 34, 40, 704 N.Y.S.2d 1, 7 (1999); *Locke v. Aston*, No. 605851/00, 2002 WL 34357990 (N.Y. Sup. Ct., July 26, 2002); *Park v. Capital Cities Commc'ns, Inc.,* 585 N.Y.S.2d 902, 905 (1992). In determining whether a statement is an actionable assertion of fact that can give rise to a claim of defamation, New York courts consider whether the statement is readily understood by the reader or listener "to have a precise, unambiguous and definite meaning and can be objectively characterized as true or false." *Chau v. Lewis*, 771 F.3d 118, 128-29 (2d Cir. 2014) (citing *Steinhilber v. Alphonse,* 68 N.Y.2d 283, 291-92, 508 N.Y.S.2d 901, 905 (N.Y. 1986)). "Words that are imprecise, whose meanings are 'debatable, loose and varying,' are 'insusceptible to proof of truth or falsity.'" *Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 508 (S.D.N.Y. 2012) (quoting *Buckley v. Littell,* 539 F.2d 882, 894 (2d Cir. 1976) ("Like the phrase 'fellow traveler,' the word 'friend,' when used to describe the relationship of one prominent politician to another … has a meaning too 'debatable, loose, and varying,' to be proven.")). "As with defamation in general, courts make these assessments by looking at the full context of the communication in

---

[7] Notably, a bomb is also described as a product that can "injure or kill people" or "damage or destroy property." MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/bomb (last visited May 6, 2015). It is undeniable that Plaintiff's products have the capacity to injure or kill people and to damage property. Indeed, Plaintiff's product materials specifically warn users to beware of "shrapnel" and of the risk of "serious injury or death" if the product is misused or mixed incorrectly. *See* Am. Compl. Ex. A. The Court can also take judicial notice of the FBI, NETF and ATF advisories, all of which warn of the potential injurious or destructive misuse of exploding rifle targets.

which the statement appears, while also considering the broader social context or setting surrounding the communication." *Chau*, 771 F.3d at 129; *see also Immuno AG.*, 566 N.Y.S.2d at 914.

Here, even if the "bomb" statements were not deemed substantially true as a matter of law, the multiplicity of definitions cited above renders the term "bomb" too imprecise to be capable of being proved false. The defamation claims against NBC News based on references to Plaintiff's exploding target products as "bombs" therefore must be dismissed.

**B. Plaintiff Has Failed To Make The Rigorous Showing Of Defamation By Implication**

With respect to certain allegations, Plaintiff appears to be making a claim of defamation by implication. "Defamation by implication is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements," *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 35, 987 N.Y.S.2d 37, 42 (1st Dep't 2014) (quoting *Armstrong v. Simon & Schuster,* 85 N.Y.2d 373, 380-81, 625 N.Y.S.2d 477,481 (1995)). "To survive a motion to dismiss a claim for defamation by implication where the factual statements at issue are substantially true, the plaintiff must make a *rigorous showing* that the language of the communication as a whole can be reasonably read *both* to impart a defamatory inference *and* to affirmatively suggest that the author intended or endorsed that inference." *Stepanov*, 987 N.Y.S.2d at 43-44 (emphasis added) (adopting standard enunciated in *Chapin v. Knight-Ridder, Inc.*, 993 F2d 1087, 1093 (4th Cir. 1993) requiring "an especially rigorous showing"; the "language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference.")

The NBC Report simply does not say or imply what Plaintiff alleges, and Plaintiff certainly has not made allegations that could support a "rigorous showing" that NBC News

affirmatively intended any defamatory inferences suggested by Plaintiff. With respect to the woman injured by exploding targets, at no point does the NBC Report identify the product that caused the injury as Tannerite. The report discusses exploding targets as potentially harmful generally and only identifies Plaintiff as the "lead" manufacturer. As to Tannerite's allegation that the NBC Report implied the FBI opposed the sale of Tannerite, this is an illogical inference to draw from the report. The Report noted the FBI's warnings on exploding targets, and does not state explicitly or otherwise that the FBI has pressed for a ban on sale. The same is true with respect to Travis Bond, the firearms expert who NBC News allegedly implied is opposed to the sale of Tannerite. Again, NBC News merely noted Mr. Bond's views that the products are "dangerous," and did not endorse any specific inference as to his views concerning their sale.

### C. Plaintiff Has Failed To Plead Facts Demonstrating that NBC News Acted With the Requisite Degree of Fault

Even assuming *arguendo* that Plaintiff has pleaded a legally sufficient basis for finding falsity or defamatory implication with respect to the NBC Reports, Plaintiff has not alleged a plausible basis for concluding that NBC News acted with the requisite degree of fault.

1. Plaintiff is a limited purpose or involuntary public figure.

The plaintiff's status as a public or private figure determines the standard of fault that applies to a defamation claim. *Contemporary Mission, Inc. v. New York Times Co.*, 842 F.2d 612, 617 (2d Cir. 1988). As the Supreme Court has observed, "those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved . . . they invite attention and comment." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974); *see also James v. Gannett Co.*, 40 N.Y.2d 415, 422, 386 N.Y.S.2d 871, 876 (1976) (considering, in determining public figure status, whether the plaintiff had taken affirmative steps to attract personal attention or strived to achieve a measure of public

acclaim). Whether a plaintiff or entity is a public figure is a question of law for the court. *Celle v. Filipino Reporter*, 209 F.3d 163, 176 (2d Cir. 2000).

Public figure is a broad term that includes not only "general purpose" public figures, but also "limited purpose public figures," namely, those who "invite publicity only with respect to a narrow area of interest.'" *See James*, 386 N.Y.S.2d at 877; *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 140 (2d Cir. 1984); *see also Gertz*, 418 U.S. at 352 ("Parties who are not public figures for all purposes may still be public figures with respect to a particular controversy.") In *Lerman*, the Second Circuit identified the following attributes of a "limited purpose public figure":

> A defendant must show the plaintiff has: (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.

745 F.2d at 136-37; *see also Biro v. Conde Nast*, 963 F. Supp. 2d 255, 270 (S.D.N.Y. 2013). Corporations may be deemed public figures "because of actions taken by them which invite public comment." *Ithaca Coll. v. Yale Daily News Pub. Co.*, 433 N.Y.S.2d 530, 533 (Sup. Ct. 1980), *aff'd*, 85 A.D.2d 817, 445 N.Y.S.2d 621 (3d Dep't 1981) (citing *Reliance Ins. Co. v. Barron's, D.C.*, 442 F. Supp. 1341, 1346-49 (S.D.N.Y. 1977)). Voluntary attention-seeking or participation in a particular controversy is a key factor in determining limited public figure status. *James*, 386 N.Y.S.2d at 876; *see also Contemporary Mission*, 842 F.2d at 617 (pointing to plaintiff's press releases and public statements).

A related, albeit less common, subset are those deemed "involuntary public figures" by virtue of having "pursued a course of conduct from which it was reasonably foreseeable, at the time of the conduct, that public interest would arise." *Wells v. Liddy*, 186 F.3d 505, 539-40 (4th Cir. 1999); *see also Waldbaum v. Fairchild Pub'ns*, 627 F.2d 1287, 1298 (D.C. Cir. 1980), *cert.*

*denied,* 449 U.S. 898 (1980) ("Occasionally, someone is caught up in the controversy involuntarily and, against his will, assumes a prominent position in its outcome"); *Hatfill v. N.Y. Times Co.*, 488 F. Supp. 2d 522, 530 (E.D. Va. 2007) ("Because Plaintiff engaged in a course of conduct that was likely to invite attention and scrutiny, Plaintiff cannot now claim that he was a private figure who was dragged into this controversy unwillingly"), *aff'd on other grounds*, 532 F.3d 312, 322-24 (4th Cir. 2008); *Daniel Goldreyer, Ltd. v. Dow Jones & Co.*, 259 A.D.2d 353, 353, 687 N.Y.S.2d 64, 65 (1st Dep't 1999) ("controversial and well-known" art restorer's "use of certain questionable techniques" in restoration of painting for museum rendered him "an involuntary limited purpose public figure"); *Kelly v. State*, 131 A.D.2d 176, 179, 520 N.Y.S.2d 959, 961 (3d Dep't 1987) ("While claimant may not have sought the State and national publicity he received, he was, nonetheless, involved in a field, the deprogramming of cultists, which at the time attracted national interest and was the subject of extensive media coverage.")

Plaintiff can easily be deemed a limited purpose public figure, on either a voluntary or involuntary basis. From a voluntary standpoint, Plaintiff's CEO Daniel Tanner and its publicist Dena Woerner consistently give interviews to the media regarding the safety and misuse of Plaintiff's products, inviting public attention to their views. *See* Talbert Decl., Exs. 10-12. By way of only one example, in September 2013 Woerner sat for an on-camera interview with CNN for a report entitled *"Exploding Targets: Shooting Aid or a 'Bomb Kit For Dummies'?"* As the related Internet article (which includes a link to the video of the aired report) quotes Woerner:

> "You can Google all day long and the first thing that will be popping up, people will be misusing our product and other products, other brands of binary exploding targets. It's a misuse," said Dena Woerner, a publicist for Tannerite Sports. "Our product was created to be used as a shot indicator. . . And when you misuse a product, you could potentially be breaking the law." The rampant misuse of exploding targets is a "threat to our business," Woerner concedes, so much so that the company is now soliciting videos of people using the product as intended. "If people get hurt they're going to be more regulations and restrictions. We want

18

people to be able to have fun with the product ... if they keep misusing it, people may not have that liberty anymore."

See Mike M. Ahlers and Rene Marsh, *"Exploding Targets: Shooting Aid or a 'Bomb Kit For Dummies'?"*, CNN NEWS (Sep. 9, 2013, 1:00 PM), http://www.cnn.com/2013/09/06/us/guns-exploding-targets/. The Talbert Declaration includes numerous additional examples of media reports in which Tanner or Woerner have voluntarily given interviews in connection with the continuing public controversy and debate over exploding rifle targets.

Plaintiff can also be deemed a limited public figure from an "involuntary" standpoint. It is undeniable that Plaintiff chose to manufacture an "exploding" product that, despite its legal use in connection with shooting sports, carries an inherent and serious public safety risk arising from potential misuse. It was readily foreseeable that Plaintiff, as the self-described "originator" of the product (*see* Am. Compl., Ex. A at p. 2) and its leading manufacturer, would be drawn into any public controversy and resulting media coverage concerning those safety risks and potential regulatory measures to address them.

In sum, Plaintiff must be regarded, at a minimum, as a limited purpose or involuntary public figure on the issues at the heart of this litigation.[8]

2.   Plaintiff's bare allegations of actual malice are insufficient.

Given Plaintiff's public figure status, the complaint must allege, by clear and convincing evidence which raises the right to relief above the speculative level, that the statements were made with "actual malice," i.e., "with knowledge that they were false or with reckless disregard of whether they were false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964); *Celle*, 209 F.3d 163, 182-83 (2d Cir. 2000) (finding defendants must prove "that the publisher

---

[8]   It bears noting that Plaintiff appears to concede its public figure status by virtue of its attempt (albeit failed) to plead actual malice, without reference to any other standard of fault. *See, e.g.* Am. Compl. at ¶ 101 ("Defendants' false statements therefore were made maliciously, intentionally, and with reckless disregard for the truth or veracity of the statements.")

had a subjective awareness of either falsity or probable falsity of the defamatory statement, or

acted with reckless disregard of its truth or falsity.")

      To meet this standard, plaintiff must present "clear and convincing evidence" that the

"defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v.*

*Thompson*, 390 U.S. 727, 731 (1968); *Lerman*, 745 F.2d 123, 140 (2d Cir. 1984).   This "high

hurdle reflects 'our profound national commitment to the principle that debate on public issues

should be uninhibited, robust, and wide-open. . . .'" *Cancer Action NY v. St. Lawrence Cnty.*

*Newspapers Corp.*, 12 A.D.3d 880, 880, 784 N.Y.S.2d 727, 728 (3d Dep't 2004) (quoting *New*

*York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)); *Contemporary Mission, Inc. v. New York*

*Times Co.*, 842 F.2d 612, 619 (2d Cir. 1988) (same).

      The pleading standards for actual malice in a defamation case have become more arduous

in the wake of *Iqbal* and *Twombly*.  As Judge Oetken of this Court recently held:

> Not only is '[p]roving actual malice [ ] a heavy burden,' but, in the era of *Iqbal*
> and *Twombly,* pleading actual malice is a more onerous task as well. . . . While
> neither the Supreme Court nor the Second Circuit has precisely articulated the
> effect of *Iqbal* and *Twombly* on defamation cases, *Iqbal* itself squarely holds that,
> where a particular state of mind is a necessary element of a claim, defendant's
> pleading of that state of mind must be plausible and supported by factual
> allegations. . . . Moreover, given the difficulty of proving actual malice, as well as
> the fact that actual malice must be proven by clear and convincing evidence in
> order for a plaintiff to succeed, it stands to reason that Rule 12(b)(6) should play a
> particularly important role in testing the plausibility of a plaintiff's defamation
> claim. . . . Indeed, *Iqbal* has a "particular value" in this context, as forcing
> defamation defendants to incur unnecessary costs can "chill the exercise of
> constitutionally protected freedoms." In other words, in defamation cases, Rule
> 12(b)(6) not only protects against the costs of meritless litigation, but provides
> assurance to those exercising their First Amendment rights that doing so will not
> needlessly become prohibitively expensive.

*Biro v. Conde Nast*, 963 F. Supp.2d at 278-79 (citations omitted) (finding Plaintiff failed to state

a claim "given the lack of factual assertions suggesting actual malice" and further noting that

"[c]ourts of appeals have recently dismissed defamation cases for failure to sufficiently plead

actual malice under the more robust Rule 12(b)(6) standard articulated by the Supreme Court in *Iqbal.*"); *see also Adelson v. Harris*, 973 F. Supp. 2d 467, 503 (S.D.N.Y. 2013) ("*Iqbal* and *Twombly* require courts to dismiss defamation actions where the allegations in the complaint do not plausibly suggest actual malice and are merely conclusory.")

Plaintiff does and cannot not allege any facts to support a plausible inference that NBC News had a "subjective awareness of falsity or probable falsity," or "in fact entertained serious doubts as to the truth" of the challenged statements.  To the contrary, all of the material contained in the NBC Reports, including the FBI warning, the Maryland ban, the interviews with a sitting United States Senator and a firearms expert, the videos of explosions involving the product in question (even assuming those uses were contrary to the product instructions), more than amply supported a subjective belief in the truthful description of the exploding targets as "bombs."  The Complaint's conclusory allegations of actual malice are simply insufficient to meet Plaintiff's pleading burden.

3.   The NBC Report Was Well Within the Sphere Of Public Concern and Plaintiff Cannot Allege "Gross Irresponsibility" On the Part Of NBC News.

Even if Plaintiff were not deemed a limited purpose or involuntary public figure, Plaintiff still fails to allege the requisite degree of fault.   Under New York law, "where the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition," a private figure plaintiff may only recover upon a showing "by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.'" *Chapadeau v. Utica Observer-Dispatch*, 38 N.Y.2d 196, 199, 379 N.Y.S.2d 61, 64 (1975)); *see also Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d

92, 101 (2d Cir. 2000); *Chaiken v. VV Publ'g Corp.*, 907 F. Supp. 689, 696 (S.D.N.Y. 1995),

*aff'd sub nom. Chaiken v. VV Pub. Corp.*, 119 F.3d 1018 (2d Cir. 1997).

New York courts are not hesitant to dismiss defamation claims at the pleading stage for

failure to plead more than conclusory allegations of gross irresponsibility.  *See Sheridan v.*

*Carter*, 48 A.D.3d 447, 448, 851 N.Y.S.2d 252, 254 (2d Dep't 2008) ("the plaintiffs failed to

allege that SUM published its statements in a grossly irresponsible manner.  Accordingly, the

Supreme Court properly dismissed the complaint…"); *Crucey v. Jackall*, 275 A.D.2d 258, 258-

59, 713 N.Y.S.2d 20, 20 (1st Dep't 2000) ("Since it is unequivocally clear that defendants did not

act with gross irresponsibility, dismissal of the complaint is warranted.")

As an initial matter, there can be no legitimate dispute that the content of the NBC Report

was "within the sphere of legitimate public concern," *Chapadeau*, 38 N.Y.2d at 199, as

evidenced by its topic of exploding rifle targets and their potential misuse, the government

advisories and legislative initiatives addressing the issue, the on-record statements of Senator

Blumenthal incorporated in the NBC Reports, and the public safety issues addressed in those

reports. In any event, a court should not second guess editorial judgments as to what constitutes a

matter of public concern 'absent clear abuse.'" *Chaiken*, 907 F. Supp. at 696 (S.D.N.Y. 1995)

(quoting *Gaeta v. New York News, Inc.*, 62 N.Y.2d 340, 349, 477 N.Y.S.2d 82 (1984)).

To determine whether a statement was published "with gross irresponsibility" courts

consider whether the news organization "(1) followed 'sound journalistic practices' in preparing

the allegedly defamatory article; (2) followed 'normal procedures,' including editorial review of

the copy; (3) had any reason to doubt the accuracy of the source relied upon and thus a duty to

make further inquiry to verify the information; and (4) could easily verify the truth." *Chaiken v.*

*VV Pub. Corp.*, 119 F.3d 1018, 1032 (2d Cir. 1997) (citing *Dalbec v. Gentleman's Companion,*

*Inc.*, 828 F.2d 921, 924-25 (2d Cir.1987)).  Here, Plaintiff has alleged no facts on which a

factfinder could plausibly conclude that NBC News acted grossly irresponsibly in publishing the

NBC Reports and in referring to exploding rifle targets as "bombs."  As detailed, *supra*, multiple

government agencies and state legislatures have identified the product as a "high explosive" and

as a potential weapon, with the capacity to injure or even kill.  Moreover, several other news

agencies have reported on the dangers of exploding targets, some also referring to them as

"bombs" or potential bombs.  Talbert Decl., Exs. 10-12.  Plaintiff pleads no facts, beyond

conclusory statements and conjecture, from which a fact finder could plausibly find that NBC

News ignored "sound journalistic practices" in preparing the allegedly defamatory article; (2)

failed to follow "normal procedures"; or (3) had any reason to doubt the accuracy of its report.

Moreover, as reflected in the NBC Reports and as the Amended Complaint

acknowledges, Am. Compl. at ¶ 91, NBC News *did* request and obtain comment from Plaintiff

and provided it an opportunity to defend its product.  Plaintiff does not allege that it was quoted

inaccurately.   Thus, Plaintiff has not and cannot plead that NBC News failed to make further

inquiry to verify its information.

Finally, Plaintiff's generalized allegations that NBC News showed a "malicious intent" or

bias against Plaintiff's products through such things as "word selection," and "dramatic

delivery," Am. Compl. at ¶ 10, are not a basis to conclude NBC News acted with gross

irresponsibility, much less "actual malice."  *See Med-Sales Assocs., Inc. v. Lebhar-Friedman,*

*Inc.*, 663 F. Supp. 908, 914 (1987) (dismissing where "[e]ven assuming [defendant] had such an

editorial bias, all publications have some sort of editorial slant, and, indeed, the variety of angles

in the press is exactly what creates the spirited debate that is the aim of the First Amendment. ....

[B]ut such a slant did not raise an inference that the paper had been grossly irresponsible").

## II. NBC IS NOT VICARIOUSLY LIABLE FOR WLEX'S REPORTS

Under New York law, in order to be liable for defamation the defendant must have published a defamatory statement of fact to a third party. *Medcalf v. Walsh*, 938 F. Supp. 2d 478 (S.D.N.Y. 2013). "'It is axiomatic that a defendant cannot be held liable for a libelous statement that it did not write or publish.'" *Melnitzky v. Rose*, 299 F. Supp. 2d 219 (S.D.N.Y. 2004) *aff'd in part*, 148 Fed. Appx. 11 (2d Cir. 2005) (*quoting Khan v. New York Times Co.,* 269 A.D.2d 74, 710 N.Y.S.2d 41, 46 (1st Dep't 2000) and dismissing complaint that "contains no facts to suggest that [defendant] played any role in the writing or alleged publication of the letter that is the subject of [plaintiff's] defamation claim"); *McGill v. Parker*, 179 A.D.2d 98, 582 N.Y.S.2d 91 (1st Dep't 1992) ("There cannot be a libel without publication.").

Plaintiff alleges, in the midst of its jurisdictional allegations against WLEX, that NBC News is vicariously liable for WLEX's own allegedly defamatory statements that were unique to its news reports and that were not included in the NBC News Reports. Am. Compl. at ¶ 46. However, Plaintiff does not and cannot allege that NBC News actually published the WLEX reports. Accordingly, absent allegation of actual publication, NBC News cannot be liable for the allegedly defamatory statements in those reports. Any claim based on NBC News' purported vicarious liability should therefore be dismissed.

## III. PLAINTIFF IS NOT ENTITLED TO INJUNCTIVE RELIEF

In addition to seeking an award of damages, the Amended Complaint seeks an order enjoining NBC News from further libel or slander. Such prior restraints are barred by the First Amendment. *Alexander v. United States*, 509 U.S. 544, 550(1993) ("a permanent injunction would constitute a "classic example[] of [a] prior restraint[]"); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 557 (1976) (restraining publication of information by the media undermines the "main purpose" of First Amendment "to prevent all such previous restraints upon publications.")

A prior restraint on expression "comes . . . with a 'heavy presumption' against its constitutional validity." *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971*); Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007).  Indeed, in *Near v. Minnesota*, 283 U.S. 697, 716 (1931), the United States Supreme Court squarely rejected the notion that allegations of libel could be sufficient to justify the issuance of a prior restraint.  *See also New Era Publications Int'l, ApS v. Henry Holt & Co.*, 695 F. Supp. 1493, 1525 (S.D.N.Y. 1988) *aff'd*, 873 F.2d 576 (2d Cir. 1989) ("[W]e accept as black letter that an injunction is not available to suppress defamatory speech.").  As the injunction Plaintiff seeks is plainly barred by the First Amendment, the Court should in any event dismiss the claim for injunctive relief.

## CONCLUSION

For the foregoing reasons, NBC News respectfully requests that its motion to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure be granted in its entirety, with prejudice.

Dated: June 26, 2015
     New York, New York

Respectfully submitted,

NBCUNIVERSAL MEDIA, LLC

By:  /s/ Daniel M. Kummer

Daniel M. Kummer
Chelley E. Talbert
Sasha Segall
NBCUniversal Media, LLC
30 Rockefeller Plaza, Rm 1221-28A18
New York, New York 10112-0002
Phone: (212) 664-4017
Fax: (212) 664-6572
Email: daniel.kummer@nbcuni.com

*Attorneys for Defendant NBCUniversal Media, LLC*