USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/1/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- X

TANNERITE SPORTS, LLC,

        Plaintiff,

    - against -

NBCUNIVERSAL MEDIA LLC and WLEX
COMMUNICATIONS, LLC,

        Defendants.

---------------------------------------------------------- X

**OPINION AND ORDER**

**15-cv-2343 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Tannerite Sports, LLC ("Tannerite") seeks injunctive and monetary relief for economic and reputational injuries that it allegedly suffered as result of statements made by NBCUniversal News Group, a Division of NBCUniversal Media, LLC ("NBCU") and WLEX Communications, LLC ("WLEX") (collectively, "defendants") in broadcast and Internet news reports published between March 23 and March 24, 2015. WLEX now moves to dismiss the Amended Complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure ("Rule") 12(b)(2) and NBCU moves to dismiss the Amended Complaint for failure to state a claim under Rule 12(b)(6).

1

## II.   BACKGROUND

### A.   Facts[1]

#### 1.   Relevant Parties

Tannerite is an Oregon-based company that "manufacturers, sells, and distributes Tannerite-brand binary (two-component) exploding rifle targets."[2] Daniel J. Tanner is the founder and President of Tannerite, as well as the inventor and patent owner of Tannerite-brand binary exploding rifle targets.[3]  Marketed for use at shooting ranges, Tannerite targets are designed to detonate upon the impact of a bullet fired from high-powered, center-fire rifles.[4]  The targets consist of

---

[1]      Several of the following facts derive from the Court's review of materials appended to the Amended Complaint ("Compl.") and exhibits attached to NBCU's declarations in support of its motion to dismiss.  "In adjudicating defendants' Rule 12(b)(6) motion, the Court 'confine[s] its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.'" *Tokio Marine & Nichido Fire Ins. Co. v. Canter*, No. 07 Civ. 5599, 2009 WL 2461048, at *4 (S.D.N.Y. Aug. 11, 2009) (quoting *Leonard F. v. Israel Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999)).  A court may also consider a document that is not incorporated by reference "where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

[2]      Compl. ¶ 51.

[3]      *See id.* ¶ 52.

[4]      *See id.* ¶¶ 53, 54.

separately packaged ammonium nitrate and pyrotechnic grade aluminum powder which, when combined, provide shooters with audibly and visually exciting acknowledgments of good marksmanship.[5]

NBCU is a limited liability corporation incorporated in Delaware.[6] NBC News Digital LLC is a Delaware corporation registered to do business in New York.  NBC News Digital's portfolio includes "NBCNews.com, msnbc.com, NBCPolitics.com, Nightly News, Meet the Press, Dateline, Newsvine, Breaking news, and the existing apps and digital extensions of these respective properties."[7]

WLEX is a limited liability company incorporated in South Carolina and headquartered in Lexington, Kentucky that operates television station WLEX-TV.[8]  WLEX-TV broadcasts reach portions of Kentucky, Indiana, and Ohio (the "broadcast zone").[9]  WLEX-TV receives some of its programming content from NBCU through an Affiliation Agreement that allows it to air NBCU's

---

[5]    *See id.* ¶¶ 58, 63.

[6]    *See id.* ¶ 48.

[7]    *Id.* ¶ 34.

[8]    *See* 5/12/15 Declaration of Pat Dalbey, General Manager of WLEX-TV, in Support of WLEX's Motion to Dismiss ("Dalbey Decl.") ¶ 2.

[9]    *See id.* ¶ 3.

programming in its broadcast zone.[10]  WLEX also operates LEX18.com, a website

publishing news and editorial content.[11]

### 2.    Tannerite Binary Exploding Rifle Targets

Tannerite binary exploding targets result from the mixture of

ammonium nitrate and aluminum powder, which the company sells as "kits"

containing the chemicals in two separate and sealed packages.[12]  The ammonium

nitrate component is comprised of an oxidizer (nitrate) and a fuel (ammonia).[13]

The aluminum component "can be considered a catalyst which provides a lower-

energy pathway to initiate a detonation."[14]  As designed, when the mixture meets

the impact of a bullet fired from a high-power rifle, an explosion ensues.[15]

In its Product Guide, Tannerite provides detailed instructions for the

safe use of its products and cautions that the dangers of misuse include serious

injury and death.[16]  The company also urges target purchasers to "mix the targets at

---

[10]    *See id.* ¶ 18.

[11]    *See id.* ¶ 2.

[12]    *See* Compl. ¶¶ 58-59.

[13]    *See* 2014 Product Guide ("Product Guide"), Ex. A to Compl., at 4.

[14]    *Id.*

[15]    *See id.*

[16]    *See id.*

4

the range and shoot them immediately," and not to "transport, store, or sell the mixed composition" unless certified to do so.[17]  Tannerite further admonishes customers against using their targets in "non-remote areas" and on surfaces or near objects that can produce shrapnel.[18]  The Product Guide also explains that:

> A properly formulated and mixed binary rifle target will provide a loud report;  will consistently detonate on bullet impact; will not start fires;  and will be safe to handle.  The use of impure ammonium nitrate or aluminum, wide variability in ammonium nitrate or aluminum particle sizes, the wrong ratio of aluminum to ammonium nitrate, and poor mixing can lead to targets that may start fires, may be less safe to handle, and may have erratic performance.[19]

In addition, the Product Guide section titled "A PLEA FOR COMMON SENSE" acknowledges that "there are, however, users doing unwise things with these targets" and warns that "[c]ontinued misuse of these targets may result in restrictions in their use."[20]  The section concludes:  "[t]he future of these targets is in your hands, so please use them properly."[21]

---

[17]   *Id.*

[18]   *Id.*

[19]   *Id.*

[20]   *Id.*

[21]   *Id.*

5

### 3. NBCU's Allegedly Defamatory Statements[22]

On March 23, 2015, NBC News aired a report ("NBCU Report") on the "Today" show about the potential dangers of exploding rifle targets. In the lead-in to the NBCU Report, reporter Jeff Rossen is shown holding two explosive rifle targets while stating: "right now I am basically holding a bomb in my hand." Rossen then introduces a series of video clips capturing unusually explosive detonations, explaining that "you're about to see what can happen when this gets in the wrong hands." In one video, a refrigerator explodes and causes a bystander, Jennifer Plank-Greer, to lose a hand due to resulting shrapnel. The NBCU Report further discusses the use of ammonium nitrate — one of the two components of Tannerite targets — by terrorists in the Oklahoma City bombing and in attacks on American soldiers in Afghanistan.

The NBCU Report also includes a graphic of an FBI bulletin warning that exploding targets have "potential use as explosives in IEDs," and shows an NBC News reporter purchasing Tannerite targets in bulk. Travis Bond, a firearms expert, expresses his opposition to the unregulated sale of exploding targets despite his strong support of the Second Amendment. Rossen then comments that

---

[22] The following facts are derived from the DVD appended to the Declaration of Chelley E. Talbert, Senior Counsel of NBCUniversal Media LLC ("Talbert Decl."), and from the NBCU Internet Article attached to the Amended Complaint.

"Tannerite is getting around the law on a technicality — separating the two ingredients even though they are sold together."  The NBCU Report also displays and narrates Tannerite's statement that "no additional regulations are needed beyond current laws because the product is safe when used correctly."  The segment concludes with Rossen reassuring the show's hosts that the targets in the studio are not dangerous without the "catalyst."

In conjunction with the NBCU Report, NBCU published an Internet Article ("NBCU Internet Article") titled "Bombs for Sale: Targets containing dangerous explosives being sold legally."  The Internet Article covers the same subjects and interviews as the NBCU Report, and links to a video of that broadcast.

### 4.    WLEX'S Allegedly Defamatory Statements

Pursuant to the Affiliation Agreement, WLEX aired the NBCU Report in WLEX-TV's broadcast zone[23] and, on March 24, 2015, WLEX broadcasted its own video ("WLEX Report") about the safety risks presented by exploding targets.[24]  The WLEX Report was also published LEX18.com.[25]  That same day, WLEX published an Internet article ("WLEX Internet Article") titled

---

[23]    *See* Compl. ¶¶ 18-19.

[24]    *See id.* ¶ 27.

[25]    *See id.* ¶ 29.

"LEX 18 Investigates - Personal Explosives Regulation,"[26] which stated that "[a]n NBC investigation found that ready made bombs are being sold in sporting goods stores, big box retailers and in almost every gun shop in the Country," and that "[t]here is federal law prohibiting people from manufacturing these products."[27]

## B.     Additional Jurisdictional Facts

Tannerite's effort to establish personal jurisdiction over WLEX focuses primarily on WLEX's business relationship with NBCU — specifically the terms of certain contracts between the companies permitting WLEX to rebroadcast NBCU content.[28]  Tannerite additionally alleges that the presence of NBCU and NBC News Digital trademarks and copyright tag lines on WLEX's website, as well as links to NBCU's website and the display of NBCU's New York address on WLEX's "Contact" page, demonstrate a close connection between the companies.[29] In addition, Tannerite claims that the WLEX Internet Article was accessible to any person in New York with Internet access.[30]

---

[26]     3/24/15 Article "Lex 18 Instigates - Personal Explosives Regulation," Ex. D to Compl.

[27]     *Id.*

[28]     *See* Compl. ¶¶ 12-17.

[29]     *See id.* ¶¶ 18-21, 30-34, 37-38, 46.

[30]     *See id.* ¶¶ 22, 29.

In support of WLEX's motion to dismiss, Pat Dalbey, General Manager of WLEX-TV, testified that:  (1) "[t]he Affiliation Agreement does not allow WLEX programming of any kind to be broadcast or distributed in New York";[31]  (2) LEX18.com content is targeted at Internet users within WLEX-TV's broadcast area;[32]  (3) only thirteen of WLEX's 43,818 email subscribers are New York residents;[33]  and (4) no more than thirteen people in New York have viewed the WLEX Internet Article.[34]

## III.   LEGAL STANDARD

### A.   Rule 12(b)(2) Motion to Dismiss

#### 1.   Standard of Proof

A plaintiff has the burden of proving personal jurisdiction by a preponderance of the evidence.[35]  "[A] plaintiff need only allege facts constituting a prima facie showing of personal jurisdiction to survive a Rule 12(b)(2) motion."[36]

---

[31]      Dalbey Decl. ¶ 20.

[32]      *See id.* ¶ 23.

[33]      *See id.* ¶ 25.

[34]      *See id.* ¶ 8.

[35]       *See Koehler v. Bank of Bermuda Ltd.,* 101 F.3d 863, 865 (2d Cir. 1996).

[36]      *M & M Packaging v. Kole*, 183 Fed. App'x 112, 114 (2d Cir. 2006) (alteration in original) (citation omitted).

The plaintiff may make such a showing with "an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant."[37]  The Court must construe all allegations in the light most favorable to the plaintiff and resolve all doubts in the plaintiff's favor.[38]

However, "a plaintiff may not rely on conclusory non-fact-specific jurisdictional allegations to overcome a motion to dismiss."[39]  Further, when a "defendant rebuts plaintiffs' unsupported allegations with direct, highly specific, testimonial evidence regarding a fact essential to jurisdiction — and plaintiffs do not counter that evidence — the allegation may be deemed refuted."[40]

### 2.    Personal Jurisdiction Generally

"Federal courts are to apply the personal jurisdiction rules of the

---

[37]    *Penguin Grp. (USA) Inc. v. American Buddha*, 609 F.3d 30, 35 (2d Cir. 2010) (quotation marks and citations omitted).

[38]    *See A.I. Trade Fin. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993). *See also In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (citation omitted).

[39]    *Doe v. Delaware State Police*, No. 10 Civ. 3003, 2013 WL 1431526, at *3 (S.D.N.Y. Apr. 4, 2013) (quotation marks omitted) (citing *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998)).

[40]    *In re Stillwater Capital Partners Inc. Litig.*, 851 F. Supp. 2d 556, 567 (S.D.N.Y. 2012) (quoting *Schenker v. Assicurazioni Genereali S.p.A., Consol.*, 98 Civ. 9186, 2002 WL 1560788, at *3 (S.D.N.Y. July 15, 2002) (quotation marks omitted)).

forum state."[41]  A court must undertake a "two-step inquiry" to determine if it can exercise personal jurisdiction over a foreign defendant.[42]  "First, we determine whether the defendant is subject to jurisdiction under the law of the forum state—here, New York.  Second, we consider whether the exercise of personal jurisdiction over the defendant comports with the Due Process Clause of the United States Constitution."[43]  Additionally, there are two types of personal jurisdiction: "general or all-purpose jurisdiction, and specific or case-linked jurisdiction."[44]  Whereas general jurisdiction allows a court to adjudicate "any and all" claims against a defendant regardless of whether the claims are connected to the forum state,[45] specific jurisdiction renders a defendant amenable to suit based only on claims "arising out or relating to the defendant's contacts with the forum state."[46]

###    3.    Specific Jurisdiction Under New York's Long-Arm Statute

---

[41]    *Penguin,* 609 F.3d at 35.

[42]    *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 224 (2d Cir. 2014).

[43]    *Id.*

[44]    *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2851 (2011).

[45]    *Id.*

[46]    *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984).

If general jurisdiction is not satisfied,[47] a federal court sitting in diversity must "determine whether there is jurisdiction over the defendant under the relevant forum state's laws."[48]  Section 302(a)(1) of New York's long-arm statute provides that a court may exercise personal jurisdiction over a non-domiciliary who "transacts any business with the state or contracts anywhere to supply goods or services within the state."[49]  Section 302(a)(3) further provides for jurisdiction over a defendant who  "commits a tortious act without the state causing injury . . . within the state, except as to a cause of action for defamation of character arising from the act,"[50] where a defendant "(i) regularly does or solicits business . . . or derives substantial revenue from . . . services rendered in the state,[51] or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate . . . commerce."[52]

To comport with due process, specific jurisdiction requires both a

---

[47]    Tannerite does not allege that this Court has general jurisdiction over WLEX.

[48]    *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999).

[49]    N.Y. Civil Practice Law and Rules ("C.P.L.R.") § 302(a)(1).

[50]    *Id.* § 302(a)(3).

[51]    *Id.* § 302(a)(3)(i).

[52]    *Id.* § 302(a)(3)(ii).

12

"minimum-contacts" and a "reasonableness" inquiry.  *First*, the plaintiff must demonstrate that "the claim arises out of, or relates to, the defendant's contacts with the forum."[53]  As the Supreme Court recently explained, "the relationship [between the defendant and the forum state] must arise out of contacts that the 'defendant himself' creates with the forum State."[54]  Though "a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties . . .  a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction."[55]  "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State."[56]  *Second*, jurisdiction must be reasonable.[57]  Courts weigh the following

---

[53]    *Licci ex rel. Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 170 (2d Cir. 2013).  *Accord Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (for the proper exercise of specific jurisdiction, the defendant must have "purposefully directed" his activities toward the forum and the litigation must "arise out of or relate to" those activities).

[54]    *Walden v. Fiore*, 134 S.Ct. 1115, 1122 (2014) (quoting *Burger King*, 471 U.S. at 475).

[55]    *Id.* at 1123 (citation omitted).

[56]    *Id.* (quoting *Burger King*, 471 U.S. at 475).

[57]    *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980).

factors in evaluating the "reasonableness" requirement of due process:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case;  (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy;  and (5) the shared interest of the states in furthering substantive social policies.[58]

### 4.    Jurisdiction Over a Claim for Defamation

Sections 302(a)(2) and (a)(3) of New York's long-arm statute expressly exclude actions for defamation, due to the judgment of New York's legislature that subjecting out of state defendants to suit in New York solely on the basis of defamation would chill free expression.[59]  However, personal jurisdiction over a defamation defendant may still be obtained under Section 302(a)(1)'s transaction-of-business prong.[60]  As this Court previously stated,

---

[58]    *Asahi Metal Indus. Co. v. Superior Ct. Of Cal.*, 480 U.S. 102, 113-14 (1987).

[59]    *See Legros v. Irving*, 327 N.Y.S.2d 371, 372 (1971) (citations omitted) (interpreting the legislative history, and advisory committee notes, of the CPLR's defamation exceptions).  *See also SPCA of Upstate N.Y. v. American Working Collie Ass'n*, 18 N.Y.3d 400, 404 (2012) (citations omitted).

[60]    *See Best Van Lines v. Walker*, 490 F.3d 239, 245-46 (2d Cir. 2007) ("Under New York law, when a person utters a defamatory statement without the state that causes injury to the plaintiff within the state, jurisdiction may be acquired under section 302(a)(1), even though section 302(a)(3) — which explicitly concerns jurisdiction as to out-of-state tortious acts that cause in-state injury — excludes defamation cases from its scope.").

14

> [J]urisdiction over a claim for defamation will lie under this
> section only if the plaintiff shows that:  (1) the defamatory
> utterance was purposefully directed at New York, as
> opposed to reaching New York fortuitously; and (2) the
> defendant transacted other business in New York that was
> directly connected to the claim asserted.[61]

Under this standard, jurisdiction is more likely to lie when the defendant's contacts

with New York were in preparation for the defamatory statement — for example,

staying in New York to research a defamatory book or news broadcast.[62]  Likewise,

jurisdiction is more likely to lie when the allegedly defamatory statements were

purposefully "written in or directed to New York[,]" as opposed to having reached

the forum fortuitously, as by an Internet post accessible to anyone.[63]  Accordingly,

"the mere fact that [a defendant] allegedly maintains a website that can be accessed

by New York citizens . . . does not establish that the [defendant] 'transacts

business' in New York."[64]

---

[61]    *Symmetra Pty Ltd. v. Human Facets*, No. 12 Civ. 8857, 2013 WL
2896876, at *9 (S.D.N.Y. June 13, 2013).

[62]    *SPCA of Upstate New York,* 18 N.Y.3d at 404 (citing *Montgomery v.
Minarcin*, 693 N.Y.S.2d 293 (3d Dep't 1999) (holding that an allegedly
defamatory news report written and researched in New York over a six-week
period and broadcast in New York was sufficient to support transaction of business
within the state)) (further citations omitted).

[63]    *See id*.

[64]    *Drucker Cornell v. Assicurazioni Generali S.p.A. Consol*., No. 97
Civ. 2262, 2000 WL 284222, at *6 (S.D.N.Y. Mar. 16, 2000).  *Accord Holey Soles*

"[A] plaintiff may not escape the special rules applicable to allegations of defamation through artful pleading:  when a claim, however denominated, sounds in defamation, the CPLR's defamation rules apply."[65] "Courts look to the substance, not merely the name, of a claim in order to determine whether that claim sounds in defamation."[66]

### 5.   Jurisdictional Discovery

"A district court has wide latitude to determine the scope of discovery."[67]  Where a plaintiff has not made a prima facie case for jurisdiction, courts are typically within their discretion to deny jurisdictional discovery.[68] However, "[e]ven if a plaintiff has not made out a prima facie showing for personal jurisdiction, 'the Court has discretion to order further discovery on the

---

*Holdings, Ltd. v. Foam Creations,* No. 05 Civ. 6893, 2006 WL 1147963, at *4 (S.D.N.Y. May 1, 2006) (holding that a Colorado-based company's website that "is not purposefully directed towards New York" provided an insufficient basis for jurisdiction).

[65]     *Symmetra,* 2013 WL 2896876, at *6 (citing *Cantor Fitzgerald, L.P. v. Peaslee,* 88 F.3d 152, 157 (2d Cir. 1996)) ("Plaintiffs may not evade the statutory exception by recasting their cause of action as something other than defamation.").

[66]     *Morsy v. Pal-Tech,* No. 07 Civ. 2143, 2008 WL 3200165, at *5 (S.D.N.Y. Aug. 7, 2008) (citations omitted).

[67]     *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 103 (2d Cir. 2008).

[68]     *See Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic,* 582 F.3d 393, 401 (2d Cir. 2009).

16

jurisdictional issue, provided that the plaintiff[ ] make[s] a threshold showing of jurisdiction and establishes that [its] position is not frivolous.'"[69]

**B.    Rule 12(b)(6) Motion to Dismiss**

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept[] all factual allegations in the complaint as true and draw[] all reasonable inferences in the plaintiff's favor."[70]  The court evaluates the sufficiency of the complaint under the "two-pronged approach" set forth by the Supreme Court in *Ashcroft v. Iqbal*.[71]  Under the first prong, a court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."[72]  For example, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[73]  Under the second prong of *Iqbal*, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they

---

[69]     *Unique Indus., Inc. v. Sui & Sons Int'l Trading Corp.*, No. 05 Civ 2744 , 2007 WL 3378256, at *6 (S.D.N.Y. Nov. 9, 2007) (quoting *Stratagem Dev. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535, 547-48 (S.D.N.Y. 1994)).

[70]     *Grant v. County of Erie*, 542 Fed. App'x 21, 23 (2d Cir. 2013).

[71]     *See* 556 U.S. 662, 678-79 (2009).

[72]     *Id.* at 679.

[73]     *Id.* at 678 (citation omitted).

plausibly give rise to an entitlement for relief."[74]  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[75]  Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[76]

## C.    Leave to Amend

Rule 15(a)(2) provides that, other than amendments as a matter of course, "a party may amend [its pleading] only by leave of court or by written consent of the adverse party."[77]  Although "[t]he Court should freely give leave when justice so requires,"[78] it is "within the sound discretion of the district court to grant or deny leave to amend."[79]  When a motion to dismiss is granted, "'[i]t is the usual practice . . . to allow leave to replead.'"[80]  Where a plaintiff inadequately

---

[74]     *Id.* at 679.

[75]     *Id.* at 678 (citation omitted).

[76]     *Id.* (quotation marks omitted).

[77]     *Slayton v. American Express Co.*, 460 F.3d 215, 226 n.10 (2d Cir. 2006) (citation and quotation marks omitted).

[78]     Fed. R. Civ. P. 15(a)(2).

[79]     *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citation omitted).

[80]     *Schindler v. French*, 232 Fed. App'x 17, 19 (2d Cir. 2007) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)).

18

pleads a claim and cannot offer additional substantive information to cure the deficient pleading, granting leave to replead is futile.[81]

## IV.    DEFAMATION

"Defamation is the invasion of an interest in reputation and good name."[82]  Whereas slander pertains to claims of allegedly defamatory words that are spoken and heard, libel concerns statements that are written and read.[83]  "To state a claim for defamation under New York Law, the plaintiff must allege:  (1) a false statement about the plaintiff;  (2) published to a third party without authorization or privilege;  (3) through fault amounting to at least negligence on [the] part of the publisher;  (4) that either constitutes defamation per se or caused 'special damages.'"[84]

"Defamation by implication is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful

---

[81]    *See Cuoco v Moritsugo*, 222 F.3d 99, 112 (2d Cir. 2000).

[82]    *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001) (citing *Hogan v. Herald Co.,* 458 N.Y.S. 2d 836, 839 (4th Dep't 1982).

[83]    *See id.*

[84]    *Gargiulo v. Forster & Garbus*, *Esqs.*, 651 F. Supp. 2d 188, 192 (S.D.N.Y. 2009) (citing *Dillon v. City of New York*, 704 N.Y.S. 2d 1, 5 (1st Dep't 1999)).

statements"[85]  In New York, "[t]o survive a motion to dismiss a claim for

defamation by implication where the factual statements are substantially true,  the

plaintiff must make a rigorous showing that the language of the communication as

a whole can be reasonably read both to impart a defamatory inference and to

affirmatively suggest that the author intended or endorsed that inference."[86]

"[T]ruth or falsity is determined by the common law standard of

substantial truth."[87]  Thus, a court may dismiss a complaint alleging defamation

where it finds the complained of statements to be substantially true and therefore

not reasonably susceptible to defamatory connotations.[88]  A statement is

substantially true and not actionable "if the published statement could have

produced no worse an effect on the mind of a reader than the truth pertinent to the

allegation."[89]  Further, "[t]he accuracy of the report should be assessed on the

---

[85]      *Armstrong v. Simon & Schuster*, 85 N.Y.2d 373, 381 (1995).

[86]      *Stepanov v. Dow Jones & Co.*, 987 N.Y.S.2d 37, 38
(1st Dep't 2014).

[87]      *Lopez v. Univision Commc'ns*, 45 F. Supp. 2d 348, 357
(S.D.N.Y. 1999).

[88]      *See, e.g., Stepanov,* 987 N.Y.S.2d at 39; *Triano v. Gannett Satellite
Info. Network*, No. 09 Civ. 2497, 2010 WL 3932334, at *5 (S.D.N.Y. Sept. 29,
2010); *Pisani v. Westchester Cnty. Health Care Corp.*, 424 F. Supp. 2d 710, 715
(S.D.N.Y. 2006).

[89]      *Mitre Sports Int'l Ltd. v. Home Box Office*, 22 F. Supp. 3d 240, 254
(S.D.N.Y. 2014) (quoting *Guccione v. Hustler Magazine*, 800 F.2d 298, 302 (2d

publication as a whole, not isolated portions of it [and a] defendant is held only to a standard of substantial, not literal, accuracy."[90]  Indeed, "[i]t is only necessary that the gist or substance of the challenged statements be true."[91]  In addition, "[w]ords that are imprecise, whose meanings are 'debatable, loose and varying,' are 'insusceptible to proof of truth or falsity.'"[92]

## V.    DISCUSSION

### A.    Rule 12(b)(2) Motion to Dismiss

#### 1.    Jurisdiction under Section 302(a)(3)

Section 302(a)(3) bars specific jurisdiction over non-domiciliaries for claims for defamation.  Tannerite attempts to avoid Section 302(a)(3)'s effect by arguing that its claims against WLEX are more properly considered under product disparagement law.[93]  However, this argument is belied by Tannerite's own pleadings.  The Amended Complaint includes claims for "libel and slander" and alleges that the defendant's words and written statements caused reputational

_____

Cir. 1986)).

[90]    *Karedes v. Ackerley Grp.*, 423 F.3d 107, 114 (2d Cir. 2005).

[91]    *Printers II v. Professionals Pub.*, 784 F.2d 141, 146 (2d Cir. 1986).

[92]    *Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 508 (S.D.N.Y. 2012) (quoting *Buckley v. Littell*, 539 F.2d 882, 894 (2d Cir. 1976)).

[93]    *See* Plaintiff's Corrected Memorandum of Law in Opposition to NBCUniversal Media, LLC's Motion to Dismiss (" NBC Opp. Mem.").

injury.[94]  Indeed, the sole count of the Amended Complaint alleges that "the defendant's false statements are very injurious to Plaintiff's reputation,"[95] and as a result, the plaintiff "suffered, and continues to suffer economic loss and harm to its reputation because of the Defendants' false statements."[96]

A plaintiff may not avoid the limits of Section 302(a) by disguising defamation claims as claims for other torts.[97]  Accordingly, Tannerite cannot assert personal jurisdiction over WLEX under Section 302(a)(3).

### 2.    Jurisdiction under Section 302(a)(1)

Plaintiffs seeking to establish personal jurisdiction over non-domiciliaries under Section 302(a)(1) face a stricter standard when alleging defamation claims than other torts.  Tannerite, however urges this Court to ignore the law, arguing that because WLEX's defamatory statements arose from its Affiliation Agreement with NBCU, they establish personal jurisdiction because

---

[94]    In contrast, under New York law, "'[p]roduct disparagement' refers to words or conduct which tend to disparage or reflect negatively on the quality, condition or value of a product or property." *Kirby v Wildenstein*, 784 F. Supp. 1112, 1115 (S.D.N.Y. 1992).

[95]    Compl. ¶ 88.

[96]    *Id.* ¶ 104.

[97]    *See Symmetra,* 2013 WL 2896876, at *6 (holding that "[a] plaintiff may not escape the special rules applicable to allegations of defamation through artful pleading").

they satisfy the transaction of business test under the factors articulated in *Patel v. Patel*.[98]  Tannerite further argues that, in order to establish personal jurisdiction under 302(a)(1), the alleged defamatory statements need only satisfy the "substantial nexus" test, which merely requires "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former[.]"[99]  Tannerite's argument is unavailing.

*First* — and fatally — there is no indication that WLEX purposefully directed its alleged defamatory statements at New York as required by Section 302(a)(1).  In fact, it is undisputed that WLEX-TV could not broadcast or otherwise distribute programming outside of its broadcast zone of Kentucky, Indiana, and Ohio.  In addition, with respect to the allegedly defamatory statements contained in the WLEX Internet Article, a website host is not subject to the jurisdiction of any state merely because the website may be accessed by all Internet users.  Here, only thirteen users in New York had viewed the website as of June 26, 2015, when both defendants moved to dismiss the Amended Complaint.  This is too small a number to demonstrate purposeful direction.

*Second*, even if the Affiliation Agreement demonstrated that WLEX

---

[98]     *See* 497 F. Supp. 2d 419 (E.D.N.Y. 2007).

[99]     *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339 (2012).

transacted business in New York, Tannerite has failed to show a sufficient nexus

between the Affiliation Agreement and the alleged defamatory conduct.  Tannerite

does not allege that WLEX researched or otherwise  prepared its report in New

York.  Further, "only one WLEX employee, Richard Essex, worked on the

investigation into exploding targets, and neither Mr. Essex nor any other WLEX

employee who assisted in the broadcast interviewed any people in New York or

relied on any sources in New York in connection with the creation or broadcast of

the WLEX-TV report."[100]  In fact, "[t]he only portion of the WLEX-TV report

related in any way to NBCU programming was its single reference to NBCU's

nationally-broadcast news report on exploding targets."[101] Moreover, "no part of

the process was completed in or involved the State of New York, and nothing

about the Internet Article was targeted towards or otherwise involved New York

State."[102]  From these undisputed facts, it is apparent that Tannerite has failed to

make a threshold showing of jurisdiction under Section 302(a)(1).

### 3.  Jurisdictional Discovery

Tannerite requests leave to conduct jurisdictional discovery, arguing

---

[100]    Dalbey Decl. ¶ 4.

[101]    *Id.*

[102]    5/12/15 Declaration of Lillie Ruschel, Content Producer for
LEX18.com, in Support of WLEX's Motion to Dismiss ¶ 4.

that jurisdictional discovery "is typically granted where a plaintiff comes forward with specific information showing that jurisdictional discovery is likely to yield evidence supporting its allegations regarding discovery."[103]  But Tannerite has failed to make this showing.  In addition to failing to make a prima facie case for jurisdiction, Tannerite has failed to present any specific information indicating that discovery is likely to yield evidence sufficient to demonstrate that WLEX purposefully directed its statements into New York.  Accordingly, Tannerite's request for leave to conduct jurisdictional discovery is denied.

### B.      Rule 12(b)(6) Motion to Dismiss

NBCU moves to dismiss under Rule 12(b)(6) for failure to state a claim.  Tannerite alleges primarily that the NBCU Report and NBCU Internet Article contained defamatory statements that were harmful and made with malice.[104]  Tannerite takes particular issue with reporter Jeff Rossen's statement that, "right now I am basically holding a bomb," made while he held two exploding rifle targets, as well as with the title of the NBCU Internet Article which reads, "Bombs for Sale: Targets containing dangerous explosives being sold legally."[105]

---

[103]     Plaintiff's Corrected Memorandum of Law in Opposition to WLEX Communications LLC's Motion to Dismiss at 11.

[104]     *See* Compl. ¶¶ 101-104.

[105]     NBC Opp. Mem. at 8-9.

Tannerite's claim for defamation rests on its assertion that its exploding targets are not bombs,[106] which it defines as "destructive devices that are strictly regulated by the federal and state governments"[107] that are "capable of exploding with few or no additional components."[108]  Tannerite further alleges that "the gist of NBCU's report was that Tannerite-brand targets are dangerous as sold, which is false,"[109] and that NBCU falsely implied that:  (1) "a Tannerite-brand target was used to cause injury to Jennifer Plank-Greer;"  (2) "firearms expert, Mr. Travis Bond, opposes the sale of Tannerite-brand targets as 'unacceptable';  and (3) "Tannerite Sports is in cahoots with overseas terrorists."[110]  NBCU responds that these statements were either substantially true or too imprecise to be provably false, and that Tannerite failed to make a rigorous showing of defamation by implication, as required to survive a motion to dismiss.[111]

          While the Court must accept the plaintiff's allegations as true, it need

---

[106]     *See* Compl. ¶ 84.

[107]     *Id.* ¶ 83.

[108]     NBC Opp. Mem. at 9.

[109]     Compl. ¶ 76.

[110]     NBC Opp. Mem. at 2, 5.

[111]     *See* Memorandum of Law in Support of NBCUniversal Media, LLC's Motion to Dismiss.

not do so with respect to conclusory definitions.  There is no question that "Tannerite-brand binary *exploding* rifle targets"[112] explode.  That is their purpose. Indeed, Tannerite's Product Guide details the explosive nature of the targets and provides a multitude of warnings for their safe and proper use.  As a result, the statements in the NBCU Report and NBCU Internet Article characterizing the exploding targets as bombs were substantially true, and therefore not provably false.  This does not mean that NBCU's uses of the word "bomb" met the precise definition of the word.  Rather, "the gist or substance of the challenged statements"[113] were true in light of the many meanings that reasonable audiences associate with the word.

In addition, neither the NBCU Report nor NBCU Internet Article suggested that Tannerite's exploding rifle targets are dangerous before the component ingredients are mixed, or that proper use of the products causes destruction or injury.  Rather, the focus of the NBCU Report was that Tannerite and others were able to sell exploding targets legally, which is of concern given the dangers associated with their misuse.  As the NBCU Report explained, Tannerite sells the targets with the component ingredients separated.  The NBCU Report

---

[112]     Product Guide at 2, 4, 12 (emphasis added).

[113]     *Printers II*, 784 F.2d at 146.

included a full demonstration of how to mix the component ingredients and

detonate the resulting target with a bullet, further conveying to a reasonable viewer

that the products are not explosive or dangerous in their inert form "as they appear

to customers on the shelf of a store, or as they would arrive to the consumer by

mail through an online purchase."[114]  It is also significant that Rossen stated in the

NBCU Report that the targets in the studio were not dangerous without the

catalyst.  The NBCU Internet Article repeats much of the NBCU Report's

substance, including the statements by Bond, the firearms expert, about how

Tannerite legally sells targets by separating the two ingredients, but that "*once it's*

*mixed*, it's classified as an explosive."[115]

> The NBCU Report makes clear that fireballs and exploding objects do

not result from proper use of the Tannerite targets.  For example, when introducing

the montage of explosions, Rossen states, "you are about to see what can happen

when this gets into the *wrong* hands."[116]  The NBCU Report also includes

Tannerite's statement that "the only injuries that have ever happened were results

---

[114]     NBCU Opp. Mem. at 10.

[115]     *See* 3/23/15 NBCU Article "Bombs for sale: Targets containing
dangerous explosive being sold legally," Ex. C to Compl. (emphasis added).

[116]     *See* 3/23/15 NBCU DVD "Rossen Reports - Exploding Targets
TODAY," Ex. 1 to Talbert Decl. (emphasis added).

from the shooter misusing the products."[117]

Because no viewer could conclude that the explosions featured in the NBCU Report resulted from the proper use of Tannerite products, Tannerite has failed to make "a rigorous showing that the communication as a whole can be reasonably read to impart a defamatory inference."[118]  For similar reasons, no defamatory inference can be drawn from the video of Ms. Plank-Greer's injury, which clearly resulted from a reckless and improper use of an exploding target, or from the text of the NBCU Internet Article.

### C.    Leave to Amend

Based on Tannerite's failure to make out a prima facie case for personal  jurisdiction over WLEX or present proof of falsity with respect to NBCU's statements in the NBCU Report and NBCU Internet Article, it would be futile to permit Tannerite to further amend its Complaint.  Accordingly, leave to amend is denied.

## VI.    CONCLUSION

For the foregoing reasons, defendants' respective motions to dismiss are GRANTED, and Tannerite's request for jurisdictional discovery is DENIED.

---

[117]    *Id.*

[118]    *Stepanov*, 987 N.Y.S.2d at 44.

The Clerk of the Court is directed to close these motions [Dkt. Nos. 21 and 27], and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            October 1, 2015

30

**-Appearances-**

**For Plaintiff:**

David L. Cargille, Esq.
Kevin M. Drucker, Esq.
Mendelsohn, Drucker, & Dunleavy, P.C.
1500 John F. Kennedy Blvd., Suite 312
Philadelphia, PA 19102
(215) 599-0984

**For Defendant WLEX Communications, LLC:**

David E. Mills, Esq.
Stephanie B. Turner, Esq.
Cooley LLP
1299 Pennsylvania Ave., NW, Suite 700
Washington, DC 20004
(202) 842-7800

**For Defendant NBCUniversal News Group:**

Daniel M. Kummer, Esq.
Chelley Ernette Talbert, Esq.
NBCUniversal
30 Rockefeller Plaza
New York, NY 10112
(212) 664-2527